POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Shareholder*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANTHONY BOYDA, Derivatively on Behalf of ANAPTYSBIO, INC.,<br><br>                              Plaintiff,<br><br>        v.<br><br>HAMZA SURIA, MARCO LONDEI, DOMINIC G. PISCATELLI, JAMES N. TOPPER, HOLLINGS RENTON, JOHN SCHMID, DENNIS FENTON, J. ANTHONY WARE AND LAURA J. HAMILL, JAMES A. SCHOENECK, NICHOLAS LYDON and CAROL G. GALLAGHER,<br><br>                              Defendants,<br><br>        and<br><br>ANAPTYSBIO, INC.<br><br>                              Nominal Defendant. | Case No. **'20CV1710 JM   JLB**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

}

Plaintiff Anthony Boyda ("Plaintiff" or "Boyda"), by and through his undersigned counsel, brings this derivative complaint for the benefit of nominal defendant AnaptysBio, Inc. ("AnaptysBio" or the "Company"), against Individual Defendants Hamza Suria ("Suria"), Marco Londei ("Londei"), Dominic G. Piscatelli ("Piscatelli"), James N. Topper ("Topper"), Hollings Renton ("Renton"), John Schmid ("Schmid"), Dennis Fenton ("Fenton"), J. Anthony Ware ("Ware"), Laura J. Hamill ("Hamill"), James A. Schoeneck ("Schoeneck"), Nicholas B. Lydon ("Lydon"), and Carol G. Gallagher ("Gallagher") (collectively, the "Individual Defendants," and together with AnaptysBio, the "Defendants") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by AnaptysBio with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.   NATURE AND SUMMARY OF THE ACTION

1.   AnaptysBio is a clinical stage biotechnology company focused on the discovery and development of drugs for the treatment of inflammation and immuno-oncology conditions with unmet medical needs. This shareholder derivative action is brought for the benefit of AnaptysBio, based on wrongdoing committed by the Individual Defendants, who are current and/or former directors and officers of AnaptysBio. The claims alleged against the Individual Defendants relate to the Company's lead product candidate, etokimab (also knwn as ANB020), a drug intended for the treatment of various inflammatory diseases. The Individual Defendants' misconduct specifically relates to false and misleading statements regarding the efficacy of etokimab for the treatment of atopic dermatitis, a chronic inflammatory skin disease otherwise known as eczema, as well as peanut allergies between approximately October, 2017 through the present (the

"Relevant Period").

2.     On October 10, 2017, the Indiviudal Defendants caused the Company to report data from an interim analysis of its Phase 2a clinical trial of etokimab in atopic dermatitis. Specifically, the Company's press release touted the "positive" data as "provid[ing] a solid foundation for the continued development of [etokimab] across a number  of atopic diseases." In addition, the press release quoted defendant Suria as stating: "[w]e are very encouraged by the efficacy results to date in this Phase 2a study, which exemplify our strategic focus on developing first-in-class anti-inflammatory antibody therapeutics to help patients suffering from debilitating inflammatory diseases." Contemporaneous with defendant Suria's positive statements, certain of the Individual Defendants caused the Company to file a Registration Statement on Form S-1 with the Securities and Exchange Commission. This S-1 repeated the statements found in the October 10, 2017 press release and offered 3,000,000 shares of AnaptysBio common stock to be sold in a secondary offering at $68.50 per share. The offering closed on October 17, 2017. Total proceeds reaped by AnaptysBio amounted to approximately $205.5 million. The Indiviudal Defendants conducted another secondary public offering in September 2018. In this secondary offering, they raised approximately $207 million on the sale of 2.2 million shares of AnaptysBio common stock.

3.     Throughout the Relevant Period, the Individual Defendants touted the prospects of etokimab and the drug's efficacy based on clinical trial data.  In truth, however, the Individual Defendants failed to disclose key information from the trials and used questionable analysis which made the trial results regarding etokimab's efficacy and its prospects appear far better than they were.

4.     The truth began to emerge on March 26, 2018, when the Individual Defendants caused the Company to announce data from an interim analysis of a Phase 2a trial for etokimab in adult patients with peanut allergies. Although the Company reported improvement among patients that received a single dose of etokimab compared to patients dosed with a placebo, later that day, an analyst from RBC Capital Markets issued a report

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

that questioned the veracity of that data. Specifically, the analyst reported that AnaptysBio misrepresented etokimab's response rate by only releasing data for a subset of patients in the study, rather than the results from the entire patient population that was initially enrolled and intended to be treated in the trial. The RBC report also stated that the response rate for etokimab in the full trial population "does not appear to be meaningfully differentiated" relative to the placebo, explaining that the difference between the etokimab-treated arm and the placebo arm was only approximately 7%—significantly less than the 46% response rate the Company reported from its deceptive analysis. In addition, the RBC report noted that "[t]hese data remain challenging to interpret," highlighting that the "[l]ack of disclosure of improvement delta between baseline and day 14 in both trial arms obfuscates the actual improvement data and complicates contextualization of clinical meaningfulness" and makes it "difficult to contextualize the breadth of allergic protection provided by [etokimab]."

5.      On this news, the price of AnaptysBio common stock declined approximately 6%, from a closing price of $113.83 per share on March 26, 2018, to a closing price of $107.52 on March 27, 2018.

6.      On April 4, 2018, the same RBC Capital Markets analyst issued another report, this time downgrading the Company's stock and reducing the price target to $86 per share from $144 "on increased skepticism regarding [etokimab's] path forward in peanut allergy" as well as "concern surrounding management credibility." Significantly, the RBC Capital Markets report highlighted concerns that the Company's patient subgrouping and subgroup analysis in its peanut allergy trial based on symptomology to peanut doses (i.e., mild, moderate, and severe patients) was "statistically questionable."

7.      Despite investors and analysts questioning the reliability of the Company's Phase 2a peanut allergy trial data, the Individual Defendants continued to misrepresent etokimab's efficacy in the treatment of patients with atopic dermatitis and peanut allergy, touting data from the Phase 2a trial in peanut allergy as showing a "remarkable efficacy result" and describing the drug as having a "pretty profound efficacy" in its treatment

of patients with atopic dermatitis based on the Company's Phase 2a trial data for that indication.

8.     On August 7, 2018, AnaptysBio abruptly announced that it had deprioritized further clinical development of etokimab in peanut allergy patients "[a]s a result of market assessment" and would not pursue a Phase 2b clinical trial of the drug for this indication.

9.     Even after the Company abandoned its pursuit of etokimab as a treatment for peanut allergy, AnaptysBio still continued to tout the efficacy of etokimab in the treatment of atopic dermatitis, touting the "time line and robustness" of a single dose of etokimab and describing the drug's treatment of patients in its Phase 2a trial in this indication as a "really remarkable result" with "widespread efficacy."

10.    Then, on June 21, 2019, an analyst from Credit Suisse issued a report questioning the veracity of the Company's Phase 2a atopic dermatitis data. AnaptysBio had released an interim analysis of atopic dermatitis data on October 10, 2017, followed by updated data on February 17, 2018. The analyses released by the Company purported to show that etokimab demonstrated efficacy in treating atopic dermatitis. The June 21 Credit Suisse report, however, questioned patients' use of topical corticosteroids to supplement treatment of their symptoms as a rescue therapy during the study and criticized AnaptysBio's failure to provide details on the timing of rescue therapy use or whether the subjects that utilized rescue therapy were classified as responders during the trial. Significantly, the Credit Suisse report noted that even one patient responder who used rescue therapy during the trial "could substantially skew the response rates" and "chang[e] the interpretation of the data as it relates to the overall prospects of the asset." Thus, Credit Suisse concluded that, due to the study's small sample size and a lack of critical details provided by the Company, "we must consider the possibility that the presence of rescue medications could have influenced the trial's response rates" and "we are now less certain about etokimab's efficacy profile, particularly in atopic dermatitis." As a result, Credit Suisse downgraded the Company's stock to neutral from outperform and slashed its price target to $79 per share from $137.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

11.    On this news, the price of AnaptysBio common stock declined nearly 12%, from a closing price of $67.02 per share on June 20, 2019, to a closing price of $59.24 per share on June 21, 2019.

12.    On November 8, 2019, the Individual Defendants caused the Company to issue a press release announcing "very disappoint[ing]" data from the Company's ATLAS trial, a Phase 2b multi-dose study which evaluated the efficacy of etokimab in approximately 300 patients with moderate-to- severe atopic dermatitis. The press release disclosed that each of the etokimab dosing arms "failed to meet the primary endpoint of the trial, which was demonstration of statistically greater improvement in the Eczema Area and Severity Index (EASI) relative placebo at week 16." The Company also revealed that, as a result of this data, it had postponed the initiation of its Phase 2b etokimab clinical trial in asthma.

13.    This disclosure spurred several analyst downgrades, with analysts at Wedbush Securities stating that "we're disappointed and surprised by the readout" and "are now entirely removing etokimab from our valuation." Analysts at Cantor Fitzgerald "were surprised by the results" and highlighted that "the largest risk to the shares is the growing number of investor questions we are getting around credibility and execution." Analysts at RBC Capital Markets stated that although they "had reservations about prior data from etokimab programs" and the credibility of the Company's management, they were "surprised by this outright failure as well as the lack of an investor call to discuss the most significant development in the history of the company."

14.    On this news, the price of AnaptysBio common stock declined nearly 72%, from a closing price of $36.16 per share on November 7, 2019, to a closing price of $10.18 on November 8, 2019.

## II.    JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under §§14(a), 10(b), and 21D of the Exchange Act, 15 U.S.C. § 78n and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-

9.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

18.    This Court has personal jurisdiction over the Company because it is headquartered in this District, conducts the majority of its business in this District, and each of the Individual Defendants has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

20.    Plaintiff is a current shareholder of AnaptysBio common stock and has continuously held AnaptysBio common stock since June 2018.

**Nominal Defendant**

21.    AnaptysBio is a clinical stage biotechnology company incorporated in Delaware. The Company maintains its principal executive offices at 10421 Pacific Center Court, Suite 200, San Diego, California. AnaptysBio common stock trades on the NASDAQ, under ticker symbol "ANAB."

**The Individual Defendants**

22.    Defendant Suria is the Chief Executive Officer ("CEO") and President of

6

AnaptysBio. He is a current director and has served on the Company's Board since July 2011.

23.     Defendant Londei was the Chief Development Officer at AnaptysBio from September 2014 through April 2020.

24.     Defendant Piscatelli was the Chief Financial Officer ("CFO") of AnaptysBio from January 2017 through September 2019.

25.     Defendant Topper is a current director and has served on the Board since 2007.

26.     Defendant Renton is a current director and has served on the Board since June 2015.

27.     Defendant Schmid is a current director and has served on the Board since June 2015.

28.     Defendant Fenton is a current director and has served on the Board since March 2018.

29.     Defendant Ware is a current director and has served on the Board since August 2017.

30.     Defendant Hamill is a current director and has served on the Board since September 2019.

31.     Defendant Schoeneck is a former director of the Company. Schoeneck served on the Board from November 19, 2015 until his resignation on March 19, 2018.

32.     Defendant Lydon is a co-founder of the Company and former director. Lydon served on the Board from the Company's inception in 2005 until June 11, 2019.

33.     Defendant Gallagher is a former director. Gallagher resigned from the Board on March 2018.

34.     Defendants Fenton, Hamill, Schmid and Ware served on the Company's Audit Committee during the Relevant Period.

35.     Defendants Suria, Londei and Piscatelli are sometimes referred to herein as the "Officer Defendants").

## IV.   FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

36.   Each Individual Defendant, by virtue of his/her position as a director and/or officer, owed to AnaptysBio and to its shareholders the fiduciary duties of loyalty and care.  The Individual Defendants were, and are, required to act in furtherance of the best interests of AnaptysBio and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

37.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of AnaptysBio, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with AnaptysBio, each Individual Defendant had knowledge of material non-public information regarding the Company.

38.   To discharge their duties, the officers and directors of AnaptysBio were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of AnaptysBio were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c.  Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    d.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

39.     In addition, certain of the Individual Defendants are members of the Audit Committee. Pursuant to AnaptysBio's Charter of the Audit Committee, members were required to, among other things:

> a.  Assist the Board in fulfilling its oversight responsibilities relating to the Company's financial accounting, reporting, compliance and controls;
>
> b.  Oversee the integrity of the Company's accounting and financial reporting process, and
>
> c.  Assist the Board in its oversight of the Company's compliance with applicable legal and regulatory requirements.

40.     Directors are also required to comply with the Company's Code of Conduct and Ethics (the "Code of Ethics"). The Code of Ethics, states, in relevant part the following:

> The Company's success depends upon each employee and director performing his or her Company duties in compliance with applicable laws and in cooperation with governmental authorities. It is essential that employees and directors know and understand the legal and regulatory requirements that apply to the Company's business and to their specific area of responsibility. While employees and directors are not expected to have complete mastery ofthese laws, rules and regulations, they are expected to be able to recognize situations that requirethem to consult with others to determine the appropriate course of action.   To address questions in the area of legal compliance, employees should approach their supervisor or the ComplianceOfficer immediately.
>
> Legal compliance is only a part of the Company's ethical responsibility, however, and should be viewed as the minimum acceptable standard of conduct. The Company strives to actwith the utmost integrity, not just in its most important corporate decisions, but also in theactions taken every day by its employees and directors. Ethical conduct is a high ideal, but often just means exercising common sense and sound judgment. Acting ethically will help the Company become a better company, a better partner for other companies, and a better corporate citizen.

* * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Company strives to maintain complete integrity of its records and public disclosure.The Company's corporate and business records, including all supporting entries to its books of account, must be completed honestly, accurately and intelligibly. The Company's records areimportant to investors and creditors. The Company depends on its books, records and accountsaccurately and fairly reflecting, in reasonable detail, its assets, liabilities, revenues, costs andexpenses, as well as all transactions and changes in assets and liabilities.

* * *

The Company's disclosure controls and procedures are designed to help ensure that theCompany's public disclosures are full, fair and accurate, that they fairly present its financialcondition and results of operations, and that they are timely and understandable. Employees whocollect, provide or analyze information for or otherwise contribute in any way to preparing or verifying these reports should adhere to all disclosure controls and procedures and generallyassist the Company in producing financial disclosures that contain all of the information aboutthe Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks.

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosures to fail to comply with GAAP, the rules andregulations of the Securities and Exchange Commission or other applicable laws, rules and regulations;

- all employees must cooperate fully with the Company's finance department, as wellas the Company's independent public accountants and counsel, respond to theirquestions with candor and provide them with complete and accurate information tohelp ensure that the Company's books and records, as well as its reports filed with theSecurities and Exchange Commission, are accurate and complete; and

- no employee shall knowingly make (or cause or encourage any other person to make)any false or misleading statement in any of the Company's reports filed with theSecurities and Exchange Commission or any third party or knowingly omit (or causeor encourage any other person to omit) any information necessary to

make thedisclosure in any of such reports accurate in all material respects

41.    In addition, the Company maintains a Corporate Governance Guidelines document (the "Guide"), which is applicable to the Board and the directors. The Guide states, in relevant part, the following:

> The Board is ultimately responsible for oversight of the Company's legal compliance program, which is designed to protect the Company against violations of law or Company policies and procedures, and to assess risks facing the Company and management's approach to addressing such risks. The Board also reviews and, if appropriate, approves significant transactions and develops standards to be utilized by management in determining the types of transactions that should be submitted to the Board for review and approval or notification.

> Each member of the Board is expected to spend the time and effort necessary to properly discharge such director's responsibilities. Accordingly, a director is expected to regularly attend meetings of the Board and Board committees on which such director sits, and review prior to each meeting the material distributed in advance for such meeting. A director who is unable to attend a meeting (which it is understood will occur on occasion) is expected to notify the Chair or the chair of the appropriate committee in advance of such meeting.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    AnaptysBio's History and the ATLAS Clinical Trial for Etokimab

42.    AnaptysBio is a clinical stage biotechnology company focused on the discovery and development of therapeutic antibodies for the treatment of inflammation and immuno-oncology conditions with unmet medical needs. During the Relevant Period, AnaptysBio's lead drug asset was etokimab (formerly ANB020), a therapeutic antibody intended to treat various inflammatory diseases. To be successful, etokimab needed FDA approval. FDA approval for a new drug is generally a twelve to fifteen year process with multiple stages, which are described below.

43.    The process begins with preclinical testing (typically a six or seven year

11

process), wherein the manufacturer completes synthesis and purification of the drug and conducts limited animal testing. Of five thousand compounds tested, approximately five will appear promising enough to induce a company to file an Investigational New Drug Application ("IND"). If the IND is approved by the FDA and by an Institutional Review Board, the manufacturer may begin the first phase of development.

44.     The IND stage consists of three phases. In Phase 1, clinical trials using healthy individuals are conducted to determine the drug's basic properties and safety profile in humans. Typically, the drug remains in this stage for one to two years. In Phase 2, efficacy trials begin as the drug is administered to volunteers of the target population. At the end of Phase 2, the manufacturer meets with FDA officials to discuss the development process, continued human testing, any concerns the FDA may have, and the protocols for Phase 3, which is usually the most extensive and most expensive stage of drug development. During all three phases of the IND, the manufacturer can obtain accelerated development/review of the drug.

45.     The Phase 2 stage requires a clinical trial. Every clinical trial must be conducted according to a clinical trial protocol which is "[a] document that describes the objective(s), design, methodology, statistical considerations, and organization of a trial. The protocol usually also gives the background and rationale for the trial, but these could be provided in other protocol referenced documents." Guidance for Industry: E6 Good Clinical Practice: Consolidated Guidance, § 1.44 (Food & Drug Admin., 1996) (Avail: http://www.fda.gov/downloads/Drugs/Guidances/ucm 073122.pdf). The trial protocol also includes information regarding "[t]he follow-up for subjects withdrawn from investigational product treatment/trial treatment," *id*. at § 6.5.3(d), and "[t]he treatment(s) to be administered, including the name(s) of all the product(s), the dose(s), the dosing schedule(s), the route/mode(s) of administration, and the treatment period(s), including the follow-up period(s) for subjects for each investigational product treatment/trial treatment group/arm of the trial," *id*. at § 6.6.1.

46.     The sponsor of the clinical trial is responsible for designing the protocol, and

when doing so, "should utilize qualified individuals (e.g., biostatisticians, clinical pharmacologists, and physicians) as appropriate." *Id*. at § 5.4.1. After the sponsor designs the protocol, the sponsor provides it to the trial investigator to be used when testing patients. Specifically, "[t]he investigator/ institution should conduct the trial in compliance with the protocol agreed to by the sponsor and, if required, by the regulatory authority(ies), and which was given approval/favorable opinion by the IRB/IEC. The investigator/institution and the sponsor should sign the protocol, or an alternative contract, to confirm their agreement." *Id*. at § 4.5.1.

47.    Similar to Phase 2, Phase 3 likewise requires a clinical trial, but usually one which contains a larger patient population. Phase 3 trials are conducted to confirm and expand on safety and effectiveness results from Phase 1 and 2 trials, to compare the drug to standard therapies for the disease or condition being studied, and to evaluate the overall risks and benefits of the drug. This trial phase recruits a large group of people with the disease or condition, usually ranging from 1,000 to 3,000 participants.

48.    Once Phase 3 is complete, the manufacturer files an NDA. Review of the NDA typically lasts one to two years, bringing total drug development and approval (that is, the IND and NDA stages) to approximately nine years. During the NDA stage, the FDA consults advisory committees made up of experts to obtain a broader range of advice on drug safety, effectiveness, and labeling. Once approved, the drug may be marketed with FDA regulated labeling. The FDA also gathers safety information as the drug is used and adverse events are reported, and it will occasionally request changes in labeling or will submit press releases as new contraindications arise. If adverse events appear to be systematic and serious, the FDA may withdraw a product from the market.

49.    By 2017, AnaptysBio began testing the efficacy of etokimab in various clinical trials for several inflammation disorders, including atopic dermatitis, peanut allergy, and asthma. In October 2017, AnaptysBio reported data from an interim analysis of its Phase 2a trial of etokimab in atopic dermatitis, which enrolled 12 moderate-to-severe atopic dermatitis adult patients who were each given a single dose of placebo within 14

days of enrollment, followed by a single dose of etokimab one week after receiving the placebo. Clinical response was assessed by the improvement of each patient's EASI score at key points after receiving the etokimab dose relative to their baseline EASI score. The primary efficacy objective of this study was to demonstrate at least an EASI-50 response, which is 50% or better improvement in EASI score relative to enrollment baseline, in at least half of the patients in the study on day 29 after receiving a dose of etokimab. In February 2018, the Company reported updated data from this trial.

50.     In late March 2018, AnaptysBio reported data from an interim analysis of its Phase 2a trial of etokimab in peanut allergy, which enrolled 20 adult peanut allergy patients with a clinical history of anaphylaxis after peanut exposure. This trial assessed the efficacy of etokimab in treating peanut allergy by measuring the cumulative dose of peanut protein (up to a maximum of 500mg) tolerated by patients in an oral food challenge conducted 14 days after a single dose of etokimab or placebo relative to a peanut tolerance established by a baseline oral food challenge.

51.     By May 2018, AnaptysBio had initiated a Phase 2b multi-dose study in 300 adult patients with moderate-to-severe atopic dermatitis, which it called the ATLAS trial.

## VI.   THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

### A.   October 2017 Etokimab Results

52.     On October 10, 2017, the Individual Defendants caused AnaptysBio to issue a press release announcing the results from an interim analysis of data from its Phase 2a clinical trial of etokimab in atopic dermatitis. The press release touted the drug's efficacy results as "very encourag[ing], highlighting the "rapid and sustained benefit observed in patients after a single dose of [etokimab]."

53.     That same day, the Company held a conference call with analysts to discuss the interim analysis of data from its Phase 2a atopic dermatitis trial. During the call, defendant Suria described the "positive" data as "provid[ing] a solid foundation for the continued development of [etokimab] across a number of atopic diseases" and stated that

"[w]e believe we can build on that with multidosing … in a Phase IIb study, we anticipate that we can get to even greater EASI scores." Marco Londei ("Londei"), the Company's Chief Medical Officer ("CMO") stated that "[b]ased upon this data, we believe that a single dose of [etokimab] can maintain efficacy benefit in adult moderate-to-severe atopic dermatitis patients for approximately 2 months, which meaningfully differentiate [etokimab] in terms of patient convenience." Further, during the call, defendant Suria explained that because the underlying physiological cause is similar across all the atopic diseases that etokimab is intended to treat, including atopic dermatitis, peanut allergy and asthma, "we are encouraged by what we're seeing so far in the results disclosed today and what that means in terms of potential translation to the peanut allergy trial."

### B.   October 2017 Secondary Public Offering

54.    On or around October 12, 2017, AnaptysBio conducted a secondary offering (the "2017 SPO") pursuant to a registration statement (the "2017 SPO Registration Statement"). On October 13, 2017, AnaptysBio filed a prospectus for the 2017 SPO with the SEC on Form 424B4, which incorporated and formed part of the First SPO Registration Statement (collectively, the "2017 SPO Offering Materials").

55.    The 2017 SPO Offering Materials contained false and misleading statements of material facts and omitted material facts necessary to make the statements contained therein not misleading. Specifically, in the 2017 SPO Offering Materials, the Company described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi- dose trial. The 2017 SPO Registration Statement was signed by defendants Suria, Gallagher, Lydon, Renton, Schmid, Schoeneck, Topper and Ware.

56.    The Individual Defendants raised approximately $205.5 million on the sale of 3 million shares of AnaptysBio common stock in the 2017 SPO.

### C.      3Q 2017 Financial Results

57.      On November 7, 2017, the Individual Defendants caused AnaptysBio to file its quarterly report with the SEC on Form 10-Q for the third quarter of 2017. Similar to the statements made in October 2017 in the 2017 SPO Offering Materials, the Company's 10-Q described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of- concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial.

### D.      February 2018 Etokinab Results

58.      On February 17, 2018, the Individual Defendants caused AnaptysBio to issue a press release announcing updated data from the Company's Phase 2a clinical trial of etokimab in atopic dermatitis, which was presented at the American Academy of Dermatology (AAD) Annual Meeting in San Diego. The press release stated that "[etokimab] was efficacious in all 12 patients enrolled in this trial" and "[e]fficacy was sustained through day 140 following single dose administration of [etokimab] with five of 12 patients (42 percent) achieving EASI-50" and the drug's efficacy "was not limited by disease severity." The press release also reported that "[d]ay 29 results exceeded the primary efficacy objective of the trial with 10 of 12 patients (83 percent) achieving EASI-50" and that "[o]ther atopic dermatitis efficacy endpoints … demonstrated rapid and sustained single dose [etokimab] efficacy results in a similar manner to the … EASI results."

### E.      2017 Annual Results

59.      On March 5, 2018, the Individual Defendants caused the Company to file its annual report with the SEC on Form 10-K for the fourth quarter and full year 2017. The Company's 10-K described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of- concept for [etokimab]" in this indication, "suggest[ing] that

[etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial. The 10-K also stated that the drug's "efficacy was not limited by disease severity." The 2017 10-K was signed by defendants Suria, Gallagher, Lydon, Renton, Schmid, Schoeneck, Topper and Ware.

### F.     March 2018 Etokimab Results

60.     On March 26, 2018, after the markets closed, the Individual Defendants caused the Company to issue a press release, which the Company also filed on Form 8-K with the SEC, announcing data from an interim analysis of a Phase 2a trial for etokimab in adult patients with peanut allergy. The press release reported that six of 13 patients (or 46%) improved their peanut tolerance to a cumulative 500mg at day 14 after a single dose of etokimab compared to zero of three patients (or 0%) dosed with placebo. The press release stated that the Company excluded two etokimab-dosed patients and two placebo-dosed patients from its interim analysis because they exhibited "mild" baseline symptoms, with one etokimab-dosed patient and two placebo-dosed patients being able to tolerate the 500mg maximum cumulative peanut dose at day 14 of the oral food challenge, but disclosed no further details on the excluded patients. Although the Company had excluded 20% of the patients enrolled in the trial from the interim data analysis, the press release touted the drug as a "promising new paradigm for peanut allergy patients." Thus, based on the "positive" data from the study, the Company announced its plans to continue development of etokimab in a multi-dose Phase 2b trial in moderate-to-severe baseline peanut allergy patients.

61.     On a conference call with analysts that day to discuss the Company's etokimab Phase 2a peanut allergy trial data, defendant Suria stated that "[w]e have demonstrated proof of concept in adult peanut allergy patients with moderate-to- severe baseline symptoms or a single dose of [etokimab] resulting in 46% of patients achieving the maximum-tested peanut tolerance in 14 days." When asked by an analyst what the Phase 2a peanut allergy trial results would have been had the Company included the four patients

excluded from the interim data because they exhibited mild symptoms, defendant Suria did not provide the details the analyst's question targeted, instead stating that "[w]e're not really providing a whole lot of context here on the mild because that's not our focus." Defendant Suria also stated that "there was clear separation" in the peanut tolerability amongst those patients dosed with etokimab versus those patients dosed with placebo, assuring investors that "we're seeing a clear benefit of the drug here and a clear signal for us to move forward in the moderate-to-severe baseline adult peanut allergy population." In response to another analyst's question about whether the exclusion of patients with mild symptoms was done in a prespecified manner, defendant Suria again avoided a direct answer, stating that "the intent of the study all along from the very beginning was to focus on the more severe patients." Defendant Suria then reassured investors that "not only did we get the signal that we wanted to in order to move forward, but we also learned how to focus in on the population and not just rely on anaphylaxis, but to take a look at their baseline severity as how you would segregate them."

62. The statements referenced in ¶¶52-61 were materially false and misleading and failed to disclose material adverse facts about the prospects of etokimab. In particular, the Individual Defendants failed to disclose that the Company had retrospectively excluded 20% of the patients enrolled in the peanut allergy study from the interim analysis due to their mild symptoms. As a result, the Individual Defendants' positive statements about the efficacy and prospects of etokimab in the treatment of peanut allergy were materially false and/or misleading and/or lacked a reasonable basis. Similarly, the Individual Defendants failed to disclose that certain patients' use of topical corticosteroids as a rescue therapy during the atopic dermatitus study were classified as "responders" per the study's endpoints. As a result, the Individual Defendants' positive statements about the efficacy and prospects of etokimab in the treatment of atopic dermatitis were also materially false and/or misleading and/or lacked a reasonable basis.

63. Later that day, however, an analyst from RBC Capital Markets issued a report questioning the reliability of the Company's Phase 2a peanut allergy data. The report

stated that "[etokimab's] response rate in an [intent-to-treat] population does not appear to be meaningfully differentiated" relative to the placebo.

64.   Specifically, the report explained that since AnaptysBio excluded two patients from each arm of the trial due to having mild symptoms, the difference between the etokimab-treated arm and the placebo arm was only approximately 7% on a 500mg tolerated cumulative dose intent-to-treat responder analysis basis—significantly less than the 46% response rate of etokimab-dosed patients over placebo-dosed patients the Company reported from its subgroup analysis. When considering the patients the Company excluded from its trial data analysis, seven of 15 patients (or 47%) improved their peanut tolerance to a cumulative 500mg at day 14 after a single dose of etokimab compared to two of five patients (or 40%) dosed with placebo. The report also noted that "[t]hese data remain challenging to interpret" because the Company did not disclose the average tolerated peanut dose at 14 days—it only disclosed the percentage of patients reaching 500mg tolerance—or the average improvement in peanut tolerance from the patients' baseline.  The report highlighted that the "[l]ack of disclosure of improvement delta between baseline and day 14 in both trial arms obfuscates the actual improvement data and complicates contextualization of clinical meaningfulness" and makes it "difficult to contextualize the breadth of allergic protection provided by [etokimab]." The report also questioned the Company's use of a mild versus moderate-to-severe patient stratification and its decision to exclude those patients exhibiting mild symptoms, pointing out that these exclusions were neither detailed in the clinicaltrials.gov listing nor in management's prior trial descriptions.

65.   On this news, the price of AnaptysBio common stock declined nearly 6%, from a closing price of $113.83 per share on March 26, 2018, to a closing price of $107.52 on March 27, 2018.

66.   On April 4, 2018, the same RBC Capital Markets analyst issued a report downgrading the Company's stock and reducing its price target to $86 from $144 "on increased skepticism regarding [etokimab's] path forward in peanut allergy" as well as

"concern surrounding management credibility." In particular, RBC nearly fully removed etokimab in the treatment of peanut allergy from its valuation model—decreasing its probability of success estimates for etokimab in severe adult peanut allergy to 5% from 35%. Significantly, the report highlighted concern that the Company's patient subgrouping and subgroup analysis in its peanut allergy trial based on symptomology to peanut doses (*i.e.*, mild, moderate, and severe patients) "was likely retrospective and not prespecified" and thus "statistically questionable."

67.     Despite this commentary and the knowledge that the Company's shareholders had been alerted to potential problems regarding etokimab, AnaptysBio continued to misrepresent data from its clinical trials regarding etokimab's efficacy.

### G.     1Q 2018 Financial Results

68.     On May 8, 2018, the Indiviudal Defendants caused AnaptysBio to issue a press release, which it also filed on Form 8-K with the SEC, announcing the Company's financial results for the first quarter of 2018. In the press release, defendant Suria is quoted as saying "[w]e demonstrated proof-of- concept for [etokimab] in Phase 2a trials in atopic dermatitis and peanut allergy."

69.     That same day, the Company also filed its quarterly report with the SEC on Form 10-Q for the first quarter of 2018.  The Company's 10-Q  described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial. Regarding the Company's interim analysis of data from its Phase 2a trial in peanut allergy, the 10-Q stated that "six of thirteen (46%) patients administered a single dose of [etokimab] improved peanut tolerance at the day 14 [oral food challenge] to the maximum tested cumulative 500mg dose, compared to none of the placebo dosed patients."

### H.     Bank of America Merrill Lynch Healthcare Conference

70.     On May 16, 2018, defendant Suria represented AnaptysBio and presented at

the 2018 Bank of America Merrill Lynch Healthcare Conference. During the conference, defendant Suria touted the data from the Phase 2a trial of etokimab for peanut allergy as showing a "remarkable efficacy result" and stated that "we're quite excited by this data" and "look forward to moving into a Phase IIb trial." Defendant Suria also described etokimab as having a "pretty profound efficacy" in its treatment of moderate-to-severe atopic dermatitis patients based on the Company's Phase 2a trial data for that indication.

71.    On May 29, 2018, the Individual Defendants caused AnaptysBio to issue a press release announcing the presentation of updated data from its Phase 2a clinical trial of etokimab in atopic dermatitis at the 2018 European Academy of Allergy and Clinical Immunology (EAACI) Congress in Munich, Germany. The press release stated that "[etokimab] was efficacious in all 12 patients enrolled in this trial" and "[e]fficacy was sustained through day 140 following single dose administration of [etokimab] with five of 12 patients (42%) achieving EASI-50" and the drug's efficacy "was not limited by disease severity." The press release also reported that "[d]ay 29 results exceeded the primary efficacy objective of the trial with 10 of 12 patients (83%) achieving EASI- 50" and that "[o]ther atopic dermatitis efficacy endpoints … demonstrated rapid and sustained single dose [etokimab] efficacy results in a similar manner to the … EASI results."

72.    The statements referenced in ¶¶67-70 were materially false and misleading and failed to disclose material adverse facts about the prospects of etokimab. In particular, the Individual Defendants failed to disclose that the Company had retrospectively excluded 20% of the patients enrolled in the peanut allergy study from the interim analysis due to their mild symptoms. As a result, the Individual Defendants' positive statements about the efficacy and prospects of etokimab in the treatment of peanut allergy were materially false and/or misleading and/or lacked a reasonable basis. Similarly, the Individual Defendants failed to disclose that certain patients' use of topical corticosteroids as a rescue therapy during the atopic dermatitus study were classified as "responders" per the study's endpoints. As a result, the Individual Defendants' positive statements about the efficacy and prospects of etokimab in the treatment of atopic dermatitis were also

materially false and/or misleading and/or lacked a reasonable basis.

## I.    August 2018 Etokimab Update and 3Q Financial Results

73.    On August 7, 2018, less than three months after the Individual Defendants had touted etokimab's treatment of peanut allergy as "remarkable" and led shareholders to believe it was moving into a Phase 2b trial, the Company announced that "as a result of market assessment regarding the adoption of the peanut oral food challenge in future commercial usage of etokimab in peanut allergy patients, AnaptysBio has decided to deprioritize further company-sponsored clinical development of etokimab in moderate-to-severe baseline adult peanut allergy patients" and that the Company "does not intend to utilize its clinical development resources to pursue a Phase 2b clinical trial of etokimab in peanut allergy."

74.    That same day, the Individual Defendants caused the Company to file its quarterly report with the SEC on Form 10-Q for the second quarter of 2018. The Company's 10-Q described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial.  The 10-Q also stated that "[e]tokimab results were not limited by disease severity" and "[o]ther efficacy endpoints… demonstrated rapid and sustained single dose etokimab results in a similar manner to the… EASI results."

## J.    September 2018 Secondary Public Offering

75.    On September 25, 2018, AnaptysBio conducted a secondary offering (the "2018 SPO") pursuant to a shelf registration statement that the Company filed with the SEC on Form S-3 on February 5, 2018 (the "2018 SPO Registration Statement"). On September 26, 2018, AnaptysBio filed a prospectus supplement to the Second SPO Registration Statement with the SEC on Form 424B5, which incorporated and formed part of the 2018 SPO Registration Statement (collectively, the "2018 SPO Offering

Materials").

76.     The 2018 SPO Offering Materials contained false and misleading statements of material facts and omitted material facts necessary to make the statements contained therein not misleading. Specifically, in the 2018 SPO Offering Materials, the Individual Defendants described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial. The 2018 SPO Registration Statement was signed by defendants Suria, Gallagher, Lydon, Renton, Schmid, Schoeneck, Topper and Ware.

77.     The Individual Defendants raised approximately $207 million on the sale of 2.2 million shares of AnaptysBio common stock in the 2018 SPO.

## K.     3Q 2018 Financail Results

78.     On November 8, 2018, the Individual Defendants caused the Company to file its quarterly report with the SEC on Form 10-Q for the third quarter of 2018. The Company's 10-Q described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial.

## L.     2019 JPMorgan Global Healthcare Conference

79.     On January 8, 2019, defendant Suria represented AnaptysBio and presented at the JPMorgan Global Healthcare Conference. During the conference, in describing the results from the Phase 2a trial in atopic dermatitis, defendant Suria stated that the Company had exceeded its goal of 50% responders "quite robustly" and touted the results as "a very exciting data event" because all the patients administered with a single dose of etokimab achieved at least 50 percent improvement in their EASI relative to enrollment baseline.

23

Defendant Suria also stated that the "time line and robustness of that single dose efficacy … gave us a sense that we could robustly advance this program into a multidose Phase IIb."

### M.    2019 Annual Results

80.    On February 28, 2019, the Individual Defendants caused the Company to file its annual report with the SEC on Form 10-K for the fourth quarter and full year 2018. The Company's 10-K described the data from the Phase2a trial for atopic dermatitis as demonstrating "proof-of-concept for etokimab" in this indication and "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience." The 10-K also stated that "etokimab efficacy was not limited by disease severity."

### N.    2019 Bank of America Merrill Lynch Health Care Conference

81.    On May 14, 2019, defendant Suria represented AnaptysBio and presented at the Bank of America Merrill Lynch Health Care Conference. During the conference, defendant Suria described etokimab's treatment of patients in the Phase 2a trial in atop dermatitis as a "really remarkable result where a single dose of our drug … had widespread efficacy across all these individuals." Based on the "efficacy data" from the Phase 2a trial, defendant Suria then touted etokimab as "a widespread, rapid and durable response in atopic dermatitis."

82.    The statements referenced in ¶¶72-79 were materially false and misleading and failed to disclose material adverse facts about the prospects of etokimab. In particular, the Individual Defendants failed to disclose that certain patients' use of topical corticosteroids as a rescue therapy during the atopic dermatitus study were classified as "responders" per the study's endpoints. As a result, the Individual Defendants' positive statements about the efficacy and prospects of etokimab in the treatment of atopic dermatitis were also materially false and/or misleading and/or lacked a reasonable basis.

### O.    June 21, 2019 Credit Suisse Report

83.    On June 21, 2019, an analyst from Credit Suisse issued a report that

questioned the veracity of the Company's Phase 2a atopic dermatitis data because of patients' use of topical corticosteroids as a rescue therapy during the study. In particular, the report noted that the Company did not provide any details on the timing of rescue therapy use or whether the subjects that utilized rescue therapy were classified as responders at a given time during the trial. Significantly, the report explained that because of the trial's small sample size, even a single subject who used a rescue therapy during the study and was classified as a responder "could substantially skew the response rates" and "chang[e] the interpretation of the data as it relates to the overall prospects of the asset." Thus, the report concluded that due to the study's small sample size and a lack of further details provided by the Company, "we must consider the possibility that the presence of rescue medications could have influenced the trial's response rates" and "we are now less certain about etokimab's efficacy profile, particularly in atopic dermatitis."  In addition, "concerns about the interpretability of prior [Phase 2a] atopic dermatitis data" prompted Credit Suisse "to adopt a lower probability of success assumption ahead of [Phase 2b trial] data." As a result, Credit Suisse downgraded the Company's stock to neutral from outperform and slashed its price target to $79 per share from $137.

84.    On this news, the price of AnaptysBio common stock declined nearly 12%, from a closing price of $67.02 per share on June 20, 2019, to a closing price of $59.24 per share on June 21, 2019.

## VII.   **THE TRUTH IS REVEALED**

85.    On November 8, 2019, the Individual Defendants announced "very disappoint[ing]" data from the Company's ATLAS clinical trial, a Phase 2b multi-dose study which evaluated the efficacy of etokimab in approximately 300 patients with moderate-to- severe atopic dermatitis. Specifically, the Individual Defendants disclosed that each of the etokimab dosing arms "failed to meet the primary endpoint of the trial, which was demonstration of statistically greater improvement in the Eczema Area and Severity Index (EASI) relative placebo at week 16." As a result of this data, the Company postponed the initiation of its Phase 2b etokimab clinical trial in asthma.

86.     This disclosure caused several securities analysts to immediately downgrade AnaptysBio's stock. For example, Wedbush Securities downgraded the Company's stock to neutral from outperform and slashed its price target to $20 per share from $96 following the Phase 2b miss from the ATLAS study evaluating etokimab in patients with moderate-to-severe atopic dermatitis. The report stated that "we're disappointed and surprised by the readout" and "are now entirely removing etokimab from our valuation." Analysts at Guggenheim Securities, LLC downgraded the Company's stock to neutral from buy and removed its price target entirely "following negative Phase IIb results from their key drug etokimab…in atopic dermatitis" and concluded that etokimab is "likely to be discontinued." Analysts at Cantor Fitzgerald "were surprised by the results" and highlighted that "the largest risk to the shares is the growing number of investor questions we are getting around credibility and execution." As a result, Cantor Fitzgerald removed credit to etokimab in its valuation model of the Company and slashed its price target for AnaptysBio's common stock to $28 per share from $140. Analysts at RBC Capital Markets stated that "[w]hile we had reservations about prior data from etokimab programs…as well as [management] credibility…we're surprised by this outright failure as well as the lack of an investor call to discuss the most significant development in the history of the company." Stifel Nicolaus analysts noted that the "all out failure of etokimab" in the Company's ATLAS study "calls into question its ability to demonstrate any efficacy in other atopic diseases and is no doubt the worst case scenario" for the Company.

87.     On this news, the price of AnaptysBio common stock declined nearly 72%, from a closing price of $36.16 per share on November 7, 2019, to a closing price of $10.18 on November 8, 2019.

## VIII.  DAMAGES

88.     As a direct and proximate result of the Individual Defendants' conduct, AnaptysBio has been seriously harmed and will continue to be seriously harmed. Such

harm includes, but is not limited to:

    a) Legal fees associated with the Securities Action filed against the Company, its President and CEO, its former CFO and former Chief Development Officer, and amounts paid to outside lawyers, accountants, and investigators;

    b) Any funds paid to settle the Securities Action; and

    c) Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties.

89.    In addition, as a direct and proximate result of the Individual Defendants' conduct, AnaptysBio has also suffered and will continue to suffer a loss of reputation and goodwill with its business partners, regulators, and shareholders.

90.    For at least the foreseeable future, AnaptysBio will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that AnaptysBio's ability to raise equity capital or debt on favorable terms in the future is now impaired. This is particularly problematic given the Company's ongoing need for capital (as it conducted three stock offerings in just the past three years).

## IX.   **DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

91.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

92.    Plaintiff brings this action derivatively in the right and for the benefit of AnaptysBio to redress injuries suffered, and to be suffered, by AnaptysBio as a direct

27

result of breaches of fiduciary duty by the Individual Defendants, unjust enrichment, waste of corporate assets, and violations of the Exchange Act.

93.     AnaptysBio is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

94.     Plaintiff will adequately and fairly represent the interests of AnaptysBio in enforcing and prosecuting its rights.

95.     Plaintiff has continuously been a shareholder of AnaptysBio at times relevant to the wrongdoing complained of and is a current AnaptysBio shareholder.

96.     A pre-suit demand on the Board of AnaptysBio is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven Individual Defendants: Suria, Topper, Renton, Schmid, Fenton, Ware and Hamill (the "Director Defendants"). Plaintiff only needs to allege demand futility as to at least four of the seven Directors that were on the Board at the time this action was commenced.

97.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

98.     The Director Defendants abandoned their fiduciary duties. Indeed, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors and to effectuate the two secondary public offerings conducted during the Relevant Period. Moreover, the Director Defendants failed to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the

improper statements made on the Company's behalf.

99.    As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and accordingly excused.

100.    Demand on defendant Suria is futile for additional reasons. Specifically, defendant Suria is not an independent director, as Suria's principal professional occupation is his role as President and CEO of the Company.  Indeed, the Board admits that defendant Suria is not an independent director in the Company's own public filings. Defendant Suria was ultimately responsible for all of the false and misleading SEC filings issued during the Relevant Period, which he signed.  Accordingly, there is reason to doubt that Suria is independent and that he is disinterested, and demand upon defendant Suria is not required.

101.    Demand on the Audit Committee Defendants -- Fenton, Hamill, Schmid and Ware -- is also futile in light of their conduct during some or all of the Relevant Period as members of the Audit Committee.  In connection with their roles as Audit Committee members, defendants Fenton, Hamill, Schmid and Ware were specifically charged with oversight of the accounting and financial reporting processes of the Company, the integrity of the Company's financial statements, the Company's systems of internal controls regarding finance and accounting, and the Company's risk management and compliance with legal and regulatory requirements. In light of the failure of the Individual Defendants to accurately disclose that: (i) the Company had retrospectively excluded 20% of the patients enrolled in the peanut allergy study from the interim analysis due to their mild

29

symptoms; and (ii) certain patients' use of topical corticosteroids as a rescue therapy during the atopic dermatitus study were classified as "responders" per the study's endpoints. Dut to the Audit Committee Defendants' failures, shareholders were misled as to the efficacy of etokimab as a treatment for both peanut allegery and atopic dermatitis. Thus, it is reasonable to infer that all four of the Audit Committee Defendants failed to carry out their obligations as members of the Audit Committee, in violation of their non-exculpable fiduciary duties of loyalty and good faith.  Each of them faces a substantial likelihood of liability, and accordingly pre-suit demand upon Fenton, Hamill, Schmid and Ware is excused.

102.   Demand is futile for each Director Defendant who signed a false and misleading SEC filing during the Relevant Period. As alleged herein, multiple public filings failed to accurately disclose that: (i) the Company had retrospectively excluded 20% of the patients enrolled in the peanut allergy study from the interim analysis due to their mild symptoms; and (ii) certain patients' use of topical corticosteroids as a rescue therapy during the atopic dermatitus study were classified as "responders" per the study's endpoints. The effect of these misstatements misled shareholders as to the efficacy of etokimab as a treatment for both peanut allegery and atopic dermatitis. These misstatements were found in: (i) the 2017 10-K, which was signed by defendants Suria, Renton, Schmid, Topper and Ware; (ii) the 2017 SPO Registration Statement, which was signed by defendants Suria, Renton, Schmid, Topper and Ware; and (iii) the 2018 SPO Registration Statement, which was signed by defendants Suria, Renton, Schmid, Topper and Ware. Thus, each of defendants Suria, Renton, Schmid, Topper and Ware face a substantial likelihood of personal liability, excusing demand.

103.   In violation of the Company's Code of Conduct, the Director Defendants

conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director Defendants failed to comply with the law. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile.

104.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Thus, any demand upon the Director Defendants would be futile.

105.   The acts complained of herein constitute violations of fiduciary duties owed by AnaptysBio officers and directors, and these acts are incapable of ratification.

106.   For the reasons noted above, at least four of the Director Defendants cannot consider a demand with disinterestedness and independence. Accordingly, a demand on the Board is futile and excused.

## COUNT I

**Against the Officer Defendants (Suria, Londei and Piscatelli) For Contribution Under §§10(b) and 21D of The Exchange Act**

107.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.   This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants Suria, Londei and Piscatelli, who are named

31

defendants in the Securities Action.

109.   The Company is named as a defendant in the Securities Action, which asserts claims under the federal securities laws for, among other things, violation of §10(b) of the Exchange Act.   If the Company is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of defendants Suria, Londei and Piscatelli, as alleged herein. The Company is entitled to receive contribution from those three Officer Defendants in connection with the Securities Action against the Company.

110.   As a directors and/or officers of the Company, defendants Suria, Londei and Piscatelli had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about the Company, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

111.   Defendant Suria, Londei and Piscatelli are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

112.   Accordingly, the Company is entitled to all appropriate contribution or indemnification from defendants Suria, Londei and Piscatelli who are responsible for exposing the Company to liability under the federal securities laws.

## COUNT II

### Against Individual Defendants for Breach of Fiduciary Duties

113.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

114.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AnaptysBio's business

32

and affairs.

115.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

116.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AnaptysBio.

117.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls. In further breach of their fiduciary duties owed to AnaptysBio, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company had retrospectively excluded 20% of the patients enrolled in the peanut allergy study from the interim analysis due to their mild symptoms; and (ii) certain patients' use of topical corticosteroids as a rescue therapy during the atopic dermatitus study were classified as "responders" per the study's endpoints. Shareholders were misled as to the efficacy of etokimab as a treatment for both peanut allegery and atopic dermatitis. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

118.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

119.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even

though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

120.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

121.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

122.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AnaptysBio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

123.   Plaintiff on behalf of AnaptysBio has no adequate remedy at law.

## COUNT III

### Against Individual Defendants for Unjust Enrichment

124.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

125.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual

Defendants were unjustly enriched at the expense of, and to the detriment of, AnaptysBio.

126.   The Individual Defendants either benefitted financially from the improper conduct by receiving unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from AnaptysBio that was tied to the performance or artificially inflated valuation of AnaptysBio, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

127.   Plaintiff, as a shareholder and a representative of AnaptysBio, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

128.   Plaintiff on behalf of AnaptysBio has no adequate remedy at law.

## COUNT IV

### Against Individual Defendants for Waste of Corporate Assets

129.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

130.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

131.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

132.   Plaintiff on behalf of AnaptysBio has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of AnaptysBio, demands judgment as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of AnaptysBio and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AnaptysBio;

C.     Determining and awarding to AnaptysBio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest;

D.     Directing AnaptysBio and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AnaptysBio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

     i.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

     ii.     a provision to permit the shareholders of AnaptysBio to nominate at least four candidates for election to the Board; and

     iii.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

E.     Awarding AnaptysBio restitution from the Individual Defendants, and each of them;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court may deem just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  September 1, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

***Counsel for Shareholder***

OF COUNSEL:

**POMERANTZ LLP**

Gustavo F. Bruckner
Daryoush Behbood
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Email: gfbruckner@pomlaw.com
Email: dbehbood@pomlaw.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I am a plaintiff in the within action.  I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing.  To those allegations to which I have personal knowledge, I believe those allegations to be true.  To those allegations which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __28__ day of __AUG__, 2020.

_Anthony Boyda_____
Signature

_Anthony Boyda_____
Print Name

## ATTACHMENT A

HAMZA SURIA, MARCO LONDEI, DOMINIC G. PISCATELLI, JAMES N. TOPPER, HOLLINGS RENTON, JOHN SCHMID, DENNIS FENTON, J. ANTHONY WARE AND LAURA J. HAMILL, JAMES A. SCHOENECK, NICHOLAS LYDON and CAROL G. GALLAGHER,

        Defendants,

   and

ANAPTYSBIO, INC.

        Nominal Defendant.